MAY, J.
The Department of Environmental Protection (“DEP”) appeals an adverse judgment for a regulatory taking. It argues the trial court erred in concluding: (1) the claim was ripe; and (2) the DEP had “taken” the property. We agree with the DEP on the ripeness issue and reverse.
The property consists of approximately 2.2 acres of land in Fort Pierce, which.lies between Ocean Drive and the Atlantic Ocean, south of the Fort Pierce Inlet. The inlet is protected by two jetties that extend into the Atlantic Ocean. The jetties and inlet channel cause beach erosion south of the inlet.
Congress authorized beach nourishment south of the inlet, which began in 1971, has continued since then, but will expire in 2021. The beach nourishment has saved the property from erosion. There is no expectation that the inlet or jetties will be removed. It is expected that continued beach nourishment will be needed.
In January 2004, Beach Group. Investments, LLC (“Beach Group”) pm-chased the property for $2.4 million. In July 2005, Ocean Breeze Townhomes, LLC (“Ocean Breeze”) contracted to purchase the membership interests in Beach Group for $8,718,440. The contract provided that Ocean Breeze would pay approximately $2,155,891 and, as the new owner of Beach Group, issue a promissory note to Beach Group Holdings, LLC for $6,468,440. Beach Group sought to build a high-end seventeen-unit townhome project.
Florida’s Beach and Shore Preservation Act mandates the establishment of “coastal construction control lines” (“CCCL”), which “define that portion of the beach-dune system which is subject to severe fluctuations based on a 100-year storm surge, storm waves, or other predictable weather conditions.” § 161.053(l)(a), Fla. Stat. Once a CCCL is established, no construction seaward of it may occur without first obtaining a CCCL permit from the DEP. See id. § 161.053(4).
Pursuant to section 161.053(5)(b), the DEP may not issue CCCL permits for a structure in a location that is “based on the [DEPj’s projections of erosion in the area, ... seaward of the seasonal high-water line within 30 years after the date of application for the permit. The procedures for determining such erosion shall be established by rule.” Id. § 161.053(5)(b). Pursuant to section 161.053(20), the “[DEP] may adopt rules related to the establishment of [CCCLs]; activities seaward of the [CCCL]; exemptions; property owner agreements; delegation of the program; permitting programs; and violations and penalties.” Id. § 161.053(20).
Rule 62B-33.024 of the Florida Administrative Code (“FAC”) sets forth the DEP’s current “Thirty-Year Erosion Projection Procedures.”
A 30-year erosion projection is the projection of long-term shoreline recession occurring over a period of 30 years based on shoreline change information obtained from historical measurements. A 30-year erosion projection of the seasonal high water line (SHWL) shall be made by the [DEP] on a site specific basis upon receipt of an application with the required topographic survey, pursuant to Rules 62B-33.008 and 62B-33.0081, F.A.C., for any activity affected by the requirements of Section 161.053(5), F.S.
Fla. Admin. Code R. 62B-33.024(1).
' Subsection (2)(d) regulates “[b]each nourishment or restoration projects.” Id. § 62B-33.024(2)(d). Under that section, “The [Mean High Water Line] MHWL to *682 SHWL[1] distance landward of the erosion control line (ECL) shall be determined. If the ECL is not based on a pre-project survey MHWL, then a pre-project survey MHWL shall be used instead of the ECL.” Id. § 62B-33.024(2)(d)3. The ECL is “the line ,.. which represents the landward extent of the claims of the state in its capacity as sovereign titleholder of the submerged bottoms and shores of the Atlantic Ocean.” § 161.151(3), Fla. Stat.
Because the project was seaward of the CCCL, Beach Group had to obtain a permit. To get the permit, the project had to be on the landward side of the thirty-year erosion projection line. The thirty-year erosion projection line is calculated using a five-step process. The ECL, MHWL, SHWL, and the erosion projection rate are all used in the calculation.[2] Under step one, it is necessary to locate the pre-nour-ishment project MEWL.
When the original Beach Group bought the property in January 2004, the thirty-year erosion projection calculation rule set the MHWL, the starting point, at the ECL. However, the DEP amended its thirty-year erosion projection rule in June 2004. (before Ocean Breeze purchased the membership interest in Beach Group). The new rule provided: “If the ECL is not based on a pre-project survey MHWL, then a pre-project survey MHWL shall be used instead of the ECL.”
This amendment resulted in a change of the location of the MHWL step-one starting point. The further landward the starting point, the further landward the thirty-year erosion projection line, which left less land available for development. The rule change resulted in the DEP’s denial of Beach Group’s CCCL permit because the project was seaward of the thirty-year erosion projection line. Beach Group’s position was that under the previous step-one calculation method (using a 1997 ECL), which it believed the DEP used beyond the rule amendment date, the project would have been landward of the thirty-year erosion projection line and its CCCL permit would have been approved.

Beach Group’s Application Process

Prior to closing on the 2005 property purchase contract, Ocean Breeze (now Beach Group) met with “numerous professionals,” including a land planner, civil engineer, and architect. Ocean Breeze reviewed its site plan with the city commissioners, each of whom expressed enthusiasm.
Ocean Breeze hired Michael Walther (“Walther”). of Coastal Technologies (“Coastal Tech”) to evaluate the likelihood of obtaining a CCCL permit for the property. If the proposed project was seaward of the thirty-year erosion projection line, the DEP would not issue a CCCL permit. Walther relied on the 1997 ECL as the step-one starting point and opined that it was the DEP’s practice to use it.
Prior to the July 2005 property acquisition, Coastal Tech informally provided an analysis to the DEP, requesting its approval. Coastal Tech staff emailed Harold Seltzer, a member of Beach Group (“Beach Group Seltzer”), and told him they spoke with the DEP, which said “the line of continuous construction looks good, our *683 structure is landward of that line.” According to Walther, there was no need for a more formal pre-application conference with the DEP prior to submitting the application because the DEP had been using the 1997 ECL as the starting point in calculating the thirty-year erosion projection line.
After closing in July 2005, Beach Group submitted its plans and applications for a driveway access permit and environmental resource permit to the City of Fort Pierce, which approved them. In December 2005, Beach Group submitted a formal CCCL permit application to the DEP.
In February 2006, the Coastal High Hazard Study Committee issued its final report (“Report”), recommending that the DEP strengthen setback requirements for the CCCL permit program. It recognized that “[strengthening the setbacks within the CCCL permitting program may result in economic impacts, both by restricting a property owners’ ability to construct on a parcel and to the State through potential increased takings claims."
In April 2006, DEP engineer Emmett Foster (“Foster”) concluded that Beach Group’s application was a “certain denial.” In June 2006, the DEP explained to Beach Group that its major structures might be seaward of the thirty-year erosion projection line. It suggested that Beach Group redesign the project to be landward.
In August 2006, the DEP provided Beach Group with its analysis, which recommended using a 2002 survey’s MHWL (the most landward-known survey line) in its thirty-year erosion projection calculation. Beach Group Seltzer testified that at a September 2006 meeting, the DEP “politely listened to what [Walther] had to say and then very quickly made it clear that they disagreed with [his] analysis entirely and that they had no intention to issue the permit, that they were going to deny the permit.” According to Beach Group Seltzer: “[m]y understanding was that the variance would have been, submitted and decided upon by the very people who had just finished telling us in-four-part harmony that they were absolutely under no circumstances going to issue us a permit.” Walther felt he could do nothing else to change the DEP’s mind.
- Coastal Tech’s report noted, “the D[EP] will not ‘re-visit’ its analysis of the 30-year SHWL.” It also noted that for the DEP to approve the project as currently planned, applicants would have to “submit a variance request that is subsequently approved by the D[EP] (Note: A variance request may or .may not be approved by the D[EP]).” But, Walther did not believe the DEP would adopt a variance based on a conversation he had with the DEP staff.
In November 2006, the DEP notified Beach Group that its CCCL permit application was denied based on its determirtation' that the project was seaward of its thirty-year erosion projection line. ' The DEP also found the project was not designed to minimize adverse impacts to the dune system. Beach Group petitioned for an administrative hearing.
An administrative law judge (“ALJ”) conducted a hearing, and in April 2007, issued an order recommending denial of Beach Group’s CCCL permit application because the “[p]roject extends seaward of the 30-year erosion projection.” The ALJ performed the five-step analysis under Rule 62B-33.024. The ALJ rejected Walther’s and Foster’s recommendations[3] for *684 the pre-nourishment MHWL, finding the starting point should be' the line depicted in a 1968 ‘pre-project survey. This was because the project inchided beach nourishment efforts that started in 1971 and continued through the present: The thirty-year erosion projection line was much closer to Foster’s projection than Walther’s.
The ALJ also recommended:
The likelihood of continued beach nourishment south of the inlet for the foreseeable future might be appropriate for consideration in- the context of a request for a variance or waiver under Section 120.542, Florida Statutes— A variance or waiver must be pursued through a separate proceeding.
The DEP entered a Final Order adopting the ALJ’s recommended thirty-year erosion projection line and denying Beach Group’s CCCL permit application. The DEP adopted and incorporated the ALJ’s Recommended Order subject to the DEP’s ruling on exceptions. It also noted: “This denial should not be construed as a statement of denial of any development potential for the subject parcel. The D[EP] is denying the specific proposal based upon the information submitted by the applicant and evidence presented at hearing.” The order also included the ALJ’s recommendation for Beach Group to pursue a variance.
In 2010, Beach Group lost the property to its lender in separate litigation, and a personal judgment was entered against Beach Group Seltzer, who guaranteed the loan. In March 2011, Beach Group filed a complaint against the DEP for an as-applied regulatory taking. It alleged that it purchased the property in May 2005 “with the intention of developing it consistent with City land use and zoning regulations with luxury, oceanfront towrihomes and to sell the townhomes.”
The DEP moved to dismiss the complaint for lack of ripeness, which the trial court denied. The DEP answered and asserted affirmative defenses, including that the claim was not ripe because there may be other permissible uses of the property, and Beach Group failed to apply for a waiver or variance. It moved for summary judgment on ripeness, which the court denied. The case proceeded to a non-jury trial.
Tony McNeal, the DEP’s program administrator for the CCCL permit program (“DEP Administrator McNeal”), testified that the DEP believed Beach Group’s project failed to meet the requirements of the statute and rules. He suggested that the DEP could have granted a variance from its rule addressing calculation of the erosion projection. “A variance is not available from the statute, but it is from the rule, and again, the announcement is consistent with the rule, so they could have got a variance from the rule and made it consistent with the statute.”
DEP Administrator McNeal was questioned on a series of emails between him and the new property owner in 2010. The new property owner asked if there was “[a]ny opportunity for [a] variance to accommodate prior plan of 2004,” to which DEP Administrator McNeal responded: “As stated in my e-mail below ‘The DEP cannot issue permits for major structures except certain single-family dwellings located seaward of said line.’ This is state law, which you cannot obtain a variance from.”
Per a 1999 memo, the DEP indicated that the 1997 ECL was the starting point for the thirty-year erosion projection line. An internal DEP memo from August 2004 *685 (after the rule amendment) commented that another CCCL permit application met the requirements for approval and used the 1997 ECL as the starting point for its thirty-year erosion projection line.
A May 4, 2006, survey review conducted by a DEP official noted that “The Erosion Control Line (ECL) as recorded in Plat Book 37 Page 2 of the public records of St. Lucie County is the controlling and most current line.” In a July 2006 email, John Poppell, a DEP staff member, notified Coastal Tech that he agreed with MHWL and SHWL values, and relied upon the 1997 ECL.
Following the non-jury trial, the court entered an order finding the DEP had taken the property (“Taking Order”). The court noted that Beach Group was alleging an as-applied regulatory taking under Penn Central.[4] It found the “preponderance of the evidence supports a regulatory as-applied taking ... under Penn Central”
It also found “Beach Group had a distinct and reasonable expectation’ in the development, use and sale at a profit of a seventeen-unit townhouse condominium project, based on ... the [DEP’s] published policies and historical practices.” The DEP’s regulatory policy change caused Beach Group to lose this expectation, and to suffer “substantial deprivation of the economic use of its Property.”[5] Beach Group had submitted a meaningful permit application, which was denied. , CCCL permits were dictated by statute, not rule, and any request for a variance would have been futile.
In its incorporated findings, the court explained: “Factually, the June 1, '06 Foster memo really is a bright line change of opinion and policy by [the DEP] that would stop permit permitting at a line that had been used prior and then would dictate permitting approval only to a more landward line and would result, in this case, to denial of this permit application.” It continued: ■
At [the September 2006] meeting, it was very obvious there was not going to be an approval of the permit as requested. [DEP Administrator] McNeal suggested a variance.... Walther recommended not to pursue a variance. He was of the opinion that any variance application would be denied because of what he terms the no-budge position of the D[EP], that the Foster analysis was correct and accurately stated the policy of DEP. ,Mr. McDowell also had suggested to redesign the project. And another [DEP] engineer, Gene Chalecki, was of the opinion that variance would not be granted. Based upon this,, no application for a variance was ever made.
The matter proceeded to a jury trial on damages. From the final judgment, the DEP now appeals.
The DEP makes two arguments as to why Beach Group’s takings claim is not ripe. First, it argues Beach Group failed to request a variance; and second, Beach Group failed to pursue other reasonable avenues to develop the property. Beach Group responds that its application was not “too grandiose,” and all of its applications other than the CCCL permit were approved. Its application was meaningful and the DEP denied it with finality. The DEP was not authorized to grant a variance from statutory requirements.
*686 The DEP replies that proposed agency action does not prevent an agency from changing its mind. Its Final Order included language suggesting a variance petition was open for consideration. Beach Group could have moved the thirty-year erosion projection line seaward by showing that existing beach restoration projects would continue for a sufficient length of time.
We have de novo review of legal conclusions on ripeness. Alachua Land Inv’rs, LLC v. City of Gainesville, 107 So.3d 1154, 1159 (Fla. 1st DCA 2013).
Ripeness is the threshold question in an as-applied regulatory takings claim. Id. at 1158. It requires the property owner to take “reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering the development plans for the property, including the opportunity to grant any variances or waivers allowed by law.” Palazzolo v. Rhode Island, 533 U.S. 606, 620-21, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).
Unless the permitting authority has already reached a decision on the pursuit of a variance or such a pursuit is futile, the owner is required to pursue administrative remedies to obtain a variance. City of Riviera Beach v. Shillingburg, 659 So.2d 1174, 1181 (Fla. 4th DCA 1995). Contrary to the conclusions in the Taking Order, a property owner cannot always claim that one “meaningful application,” in and of itself, is enough to ripen a claim. Alachua Land Inv’rs, LLC, 107 So.3d at 1163.
Where a variance is a reasonably possible means of allowing additional flexibility in the agency’s permit decision, the owner must apply hot only for a permit but also a variance. See McKee v. City of Tallahassee, 664 So.2d 333 (Fla. 1st DCA 1995). Here, Beach Group admittedly did not apply for a variance. Had it done so, it could have argued that the 1997 ECL should have been applied or that continued beach restoration would prevent the erosion anticipated by the DEP.
The trial court erred in interpreting the governing statute. Section 120.542, Florida Statutes, makes a distinction between “variances ... to statutes,” which are prohibited, and “variances and waivers to requirements of [agency] rules,” which are permitted. § 120.542(1), Fla. Stat. The trial court concluded that because the requirement to' obtain a CCCL permit is statutory, the DEP could not-have issued a variance. This conclusion would be correct if the question was whether the DEP could grant a variance from the requirement to obtain, a permit. But, that was not the question. The DEP had the authority to issue a variance as a matter of law because it involved a site-specific exception to its usual methods of calculating the thirty-year erosion projection line. § 161.053(5)(b), (20), Fla. Stat.
Consistent with the plain language of the statute, the methods of determining the thirty-year erosion projection line are established by the DEP through rule adoption. § 161.053(5)(b), Fla. Stat. The DEP’s erosion projection rule sets a rigid foi-mula for calculating the expected duration of a beach restoration project. The DEP had authority to grant a variance from the requirements of that rule.
As explained in footnote 13 to the ALJ’s Recommended Order:
The likelihood of continued beach nourishment south of the inlet for the foreseeable future might be appropriate for consideration in the context of a request for a variance or waiver under Section 120.542, Florida Statutes. See Pet. Ex. 21 (identifying a variance as a possible means for the Project to be approved as it is currently proposed). A variance or waiver must be pursued through a separate proceeding.
*687 The DEP incorporated that finding in its Final Order as the final word on its position regarding a variance.
The Final Order is final agency action. By incorporating the ALJ’s separate Recommended Order, the DEP invited a variance application and even went so far as suggesting a justification for one. Given the undisputed content of the final agency action, a variance application would not have been futile. Alachua Land Inv’rs, LLC, 107 So.3d at 1168 (finding case was not ripe where the municipality expressed an interest in working with the applicant); see Shillingburg, 659 So.2d at 1181; Tinnerman v. Palm Beach Cty., 641 So.2d 523, 526 (Fla. 4th DCA 1994).
Here, the DEP issued a Final Order incorporating the ALJ’s written conclusions, including his observation that the likelihood of continued nourishment projects “might be appropriate for consideration” if Beach Group applied for a variance. Simply put, the DEP provided Beach Group with the opportunity to apply for a variance. But, Beach Group did not seize that opportunity, depriving the DEP from exercising its authority to grant a variance.
The case was not ripe for a second reason: Beach Group did not propose an alternative development plan. Its planner testified that based on the location of the DEP’s erosion projection, it still would have been possible to develop a project on the property with six to ten units, with similar units sizes as the proposed Allegria project (albeit with differing amenities), and up to fifteen smaller units with fewer amenities. And, Beach Group’s former attorney suggested a single-family residence as an alternate development on the property.
The record reflects that Beach Group could have considered alternative plans for the property. “[T]he mere fact that the denial of a permit deprives a property owner of a particular use the owner deems most profitable or preferable does not demonstrate a taking.” Alachua Land Inv’rs, LLC, 107 So.3d at 1159; see MacDonald, Sommer & Frates v. Yolo Cty., 477 U.S. 340, 353 n. 9, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); Leto v. State of Fla. Dep’t of Envtl. Prot., 824 So.2d 283, 285 (Fla. 4th DCA 2002).
The purpose of the ripeness requirement is to reach certainty regarding the nature and magnitude of restrictions that a permitting agency has imposed on the property owner. There is no dispute that Beach Group did not apply for an available variance. There is no dispute that Beach Group did not pursue an alternative project.
We do not address the secondary “taking” issue as it is unnecessary to our holding. We reverse and remand the case for proceedings consistent with this opinion.

Reversed and Remanded for further proceedings consistent with this opinion.

WARNER and CONNER, JJ„ concur.

1. The SHWL is “the line formed by the intersection of the rising shore and the elevation of 150 percent of the local mean tidal range above local mean high water.” § 161.053(5)(a)2„ Fla. Stat.

. Different lines are involved in the calculation: (1) Erosion Control Line (“ECL”); (2) Mean High Water Line ("MHWL”); (3) Seasonal High Water Line ("SHWL”); (4) line of continuous construction; (5) Coastal Construction Control Line ("CCCL”); and (6) thirty-year erosion projection line.

. Walther recommended using the 1997 ECL and the Foster recommended using the 2002 MHWL survey because he did not consider *684 the 1997 ECL to be an appropriate pre-pro-ject ECL.

. Penn Central Transp. Co. v. City of N.Y., 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

. Beach Group provided expert testimony that the rule change reduced the project's profitability by 96% if a smaller project was built. Based on a six-unit condominium complex, the loss of profitability would have been 90%, which did not include the cost of land acquisition. The property had some value, but smaller developments would cause a loss.